IN RE TEMPNOLOGY LLC, n/k/a
Old Cold, LLC, Debtor.

Mission Product Holdings,
Inc., Appellant,

v.

Tempnology LLC, n/k/a Old
Cold, LLC, Appellee.

BAP NO. NH 15–065
Bankruptcy Case No. 15–11400–JMD

United States Bankruptcy Appellate Panel
of the First Circuit.

November 18, 2016

Robert J. Keach, Esq., and Michael A. Siedband, Esq., on brief for Appellant.

Daniel W. Sklar, Esq., Christopher Desiderio, Esq., and Lee Harrington, Esq., on brief for Appellee.

Before Lamoutte, Hoffman, and Cary, United States Bankruptcy Appellate Panel Judges.

Hoffman, U.S. Bankruptcy Appellate Panel Judge.

Mission Product Holdings, Inc. ("Mission") appeals from the bankruptcy court's November 12, 2015 order granting the Motion for Determination of Applicability and Scope of Mission Product Holdings, Inc.'s Election Pursuant to 11 U.S.C. § 365(n)(1)(B) (the "365(n) Motion") filed by Tempnology LLC, n/k/a Old Cold, LLC (the "Debtor").[1] At issue before the bankruptcy court was what rights Mission, as a licensee of intellectual property, retained as a result of its election under Bankruptcy Code § 365(n)[2] when the Debtor rejected the executory contract that gave rise to the license. The bankruptcy court ruled that Mission retained its nonexclusive license to use the Debtor's intellectual property as set forth in the rejected contract, but not its exclusive product distribution rights or right to use the Debtor's trademark and logo also contained in the contract. For the reasons set forth below, we **AFFIRM IN PART** and **REVERSE IN PART**.

## BACKGROUND

### I. Events Preceding Bankruptcy

Prior to a sale of substantially all its assets in 2015, the Debtor was a Portsmouth, New Hampshire-based material innovation company that developed chemical-free cooling fabrics for use in consumer products under the brand name "Coolcore." Mission is in the business of marketing and distributing innovative sports technologies.

On November 21, 2012, the Debtor and Mission entered into a Co–Marketing and Distribution Agreement (the "Agreement"). In section 1 of the Agreement, entitled "Territory," the Debtor granted Mission exclusive distribution rights within the United States and "first rights of notice and of refusal in certain other countries" (collectively defined in the Agreement as the "Exclusive Territory") with respect to an array of the Debtor's products defined as "Cooling Accessories" and identified on Exhibit A of the Agreement. The Debtor also granted Mission the nonexclusive right to sell Cooling Accessories anywhere else in the world.

---

1. In conjunction with a sale of its assets, the Debtor was required to change its name upon the sale closing. The closing occurred on December 18, 2015, and on December 21, 2015, the Debtor filed a notice with the New Hampshire Secretary of State changing its name from Tempnology LLC to Old Cold, LLC. Thereafter, the bankruptcy court granted the Debtor's motion to amend the caption of its case to reflect the name change.

2. Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific statutory sections shall be to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101, et seq. All references to "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure.

In section 5 of the Agreement, entitled "Product Exclusivity," the Debtor agreed that in the Exclusive Territory it would not license or sell certain specified Cooling Accessories, defined in the Agreement as "Exclusive Cooling Accessories," to anyone other than Mission during the term of the Agreement. [3]

In section 6, entitled "Distribution Exclusivity and Collaboration," the Debtor agreed that in the Exclusive Territory it would not sell *any* Cooling Accessories and certain other products directly or indirectly to any sporting goods and sport specialty retailers.

Section 7 of the Agreement, entitled "Cooperation and Further Assurances," provided:

> [T]hat (i) [the Debtor] shall take no actions to directly or indirectly frustrate its exclusivity obligations hereunder; (ii) [the Debtor] shall fully cooperate with [Mission] to ensure that no third parties take any actions that frustrate the purposes of the exclusivity provisions herein, and (iii) [the Debtor] shall take such actions as are necessary to enforce [the Debtor]'s intellectual property rights and contractual rights against third parties.

In section 15 of the Agreement, entitled "Intellectual Property," the Debtor granted Mission the following non-exclusive license (the "IP License"):

> Excluding those elements of the CC Property consisting of Marks [and] Domain Names, [the Debtor] hereby grants [Mission] and its agents and contractors a non-exclusive, irrevocable, royalty-free, fully paid-up, perpetual, worldwide, fully-transferable license, with the right to sublicense (through multiple tiers), use, reproduce, modify, and create derivative work based on and otherwise freely exploit the CC Property in any manner for the benefit of [Mission], its licensees and other third parties.

The Agreement defined "CC Property" as:

> [A]ll products (including without limitation the Cooling Accessories), personal products, inventions, designs, discoveries, improvements, innovations, ideas, drawings, images, works of authorship, formulas, methods, techniques, concepts, configurations, compositions of matter, packaging, labeling, software applications, databases, computer programs as well as other creative content, methodologies and materials in existence prior to this Agreement (or created outside the scope of this Agreement) or developed or provided by [the Debtor] hereunder and all *Intellectual Property Rights* with respect to any of the foregoing, excluding any materials provided by [Mission].

(emphasis added). With respect to the Debtor's trademark and logo which were excluded from the IP License, section 15(d) of the Agreement granted Mission a limited license to use the Debtor's Coolcore trademark and logo as follows:

> During the Term of the Agreement and the Wind–Down Period, [the Debtor] grants to [Mission] a non-exclusive, non-transferable, limited license, which shall expire upon the termination of this Agreement except as necessary to allow either party to exercise its rights during the Wind–Down Period, to use its Coolcore trademark and logo (as well as any other Marks licensed hereunder) for the limited purpose of performing its obli-

---

**3.** Exhibit A of the Agreement listing the Cooling Accessories provided that certain Cooling Accessories were exclusive—towels, wraps, hoodies, bandanas, "multi-chills," and doo rags—while other Cooling Accessories were identified as non-exclusive—socks, headbands, wristbands, sleeves, skull caps, yoga mats, and baselayers.

gations hereunder, exercising its rights and promoting the purposes of this Agreement as contemplated herein. . . .

The upshot of the Agreement was that during the term of the Agreement Mission enjoyed the exclusive right to sell the Cooling Accessories to sporting goods retailers in the United States and potentially certain other countries, and the exclusive right to sell Exclusive Cooling Accessories to anyone in that same territory. Additionally, Mission received a non-exclusive but perpetual license to exploit the Debtor's intellectual property and a limited license during the term of the Agreement to exploit the Coolcore brand and logo.

The Agreement had an initial term of two years and was subject to automatic renewal for additional one-year periods. Either party could terminate the Agreement with or without cause by providing written notice. Any event of termination, however, would trigger a two-year wind-down period during which Mission would retain certain rights to purchase, distribute, and sell the Cooling Accessories in accordance with the Agreement.

On June 30, 2014, Mission exercised its rights to terminate the Agreement without cause, triggering the two-year wind-down period. On July 22, 2014, the Debtor issued a notice of termination for cause, asserting that Mission had breached the Agreement. The ensuing dispute resulted in a two-phase arbitration process. On June 10, 2015, the arbitrator rendered a decision in the first phase of the arbitration, determining that the Agreement remained "in full force and effect." The second phase of the arbitration—as to whether either party had breached the Agreement—did not get very far as the Debtor's bankruptcy, and accompanying stay, brought the arbitration to a halt.

## II. The Bankruptcy Case

On September 1, 2015, the Debtor filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code. The next day, the Debtor filed a motion seeking authority to reject certain of its executory contacts, including the Agreement. The Debtor also filed a motion asking the bankruptcy court to approve the sale of substantially all of its assets free and clear of liens, claims, encumbrances, and other interests.

Mission filed an objection to the sale motion and the rejection motion, which included its notice of election pursuant to § 365(n)(1)(B). In its objection, Mission argued that notwithstanding the Debtor's rejection of the Agreement, by making an election under § 365(n) Mission retained its exclusive product distribution rights as well as its rights under the IP License and the limited trademark license and that it could continue to exercise and exploit all those rights without interference from the Debtor or the purchaser of the Debtor's assets. Mission maintained that any sale of the Debtor's assets would be subject to, not free and clear of, Mission's rights under the Agreement.

The Debtor disagreed with Mission's view of the implications of its § 365(n) election. According to the Debtor, § 365(n) protects a non-debtor licensee's rights to intellectual property when a debtor rejects a license agreement embodying intellectual property, not other rights under the contract such as distribution rights. The Debtor contended that the exclusive product distribution provisions in the Agreement did not grant Mission a right to intellectual property but rather addressed the scope of available product distribution rights and, therefore, those distribution rights were not protected by the § 365(n) election.

After an initial hearing, the bankruptcy court entered an order authorizing the

Debtor's rejection of certain executory contracts, but deferred its determination of the Debtor's proposed rejection of the Agreement. After additional briefing and another hearing, the bankruptcy court entered an order regarding rejection of the Agreement. The order provided in its entirety:

> The motion to reject the contract of Mission Product Holdings pursuant to 11 U.S.C. § 365(a) is granted and the contract is rejected as of the petition date subject to Mission Product Holdings' election to preserve its rights under 11 U.S.C. § 365(n).

This prompted the Debtor to file the 365(n) Motion, seeking a determination that Mission's post-rejection rights were limited exclusively to the IP License and that the balance of Mission's rights under the Agreement, including any exclusive product distribution rights or the right to use the Debtor's trademark and logo, did not survive rejection. Mission objected on the ground that its § 365(n) election also protected its exclusive product distribution rights and the right to use the Debtor's trademark and logo for the remainder of the wind-down period. Mission also claimed that the 365(n) Motion was procedurally defective because a request for a determination as to the scope of Mission's property rights in the Debtor's intellectual property required the commencement of an adversary proceeding pursuant to Bankruptcy Rule 7001(2).

After a non-evidentiary hearing, the bankruptcy court entered the order being appealed (the "365(n) Order") granting the 365(n) Motion and ruling: (1) Mission's election pursuant to § 365(n) protected Mission rights as a non-exclusive licensee only as to any patents, trade secrets, and copyrights as were granted to Mission in section 15(b) of the Agreement (the section identifying the property subject to the IP License); (2) Mission's election pursuant to § 365(n) provided no protectable interest in the Debtor's trademarks or trade names; and (3) Mission's election pursuant to § 365(n) provided no protectable interest in the Debtor's "Exclusive Products" and the "Exclusive Territory" as those terms were defined in the Agreement.

In its accompanying Memorandum Opinion,[4] the bankruptcy court first determined that the protections of § 365(n) extended only to the intellectual property rights granted to Mission in the Agreement. The court examined the provisions of the Agreement granting Mission exclusive distribution rights, and concluded that, even though the products to which it applied, namely the Cooling Accessories, were patented, the exclusive distribution rights did not constitute a license of intellectual property and therefore were outside the protection afforded under § 365(n). The court determined that the exclusive distribution rights granted to Mission were unrelated to the IP License and thus although the IP License was protected under § 365(n), the distribution rights were not.

With respect to the Debtor's trademarks, the bankruptcy court concluded that, to the extent the Agreement granted Mission a non-exclusive right to use certain of the Debtor's trademarks and trade names, § 365(n) did not protect Mission's trademark license post-rejection, and, as a result, "Mission does not retain rights to the Debtor's trademarks and logos post-rejection." In so ruling, the court adopted the view articulated in cases such as In re Old Carco LLC, 406 B.R. 180 (Bankr. S.D.N.Y. 2009), that because the Bankruptcy Code's definition of "intellectual property" set forth in § 101(35A) does not include trademarks and trade names, those

---

4.  In re Tempnology, LLC, 541 B.R. 1 (Bankr.    D.N.H. 2015).

categories of intellectual property are not protected under § 365(n). The court declined to follow In re Crumbs Bake Shop, Inc., 522 B.R. 766 (Bankr. D.N.J. 2014), which held that it was improper to draw a negative inference from the absence of any reference to trademarks and trade names in § 101(35A) for purposes of applying § 365(n) and that bankruptcy courts must exercise their equitable powers on a case-by-case basis to determine whether trademark licensees may retain their rights under § 365(n).

Finally, with respect to Mission's procedural argument, the bankruptcy court determined that the parties' dispute over the scope and applicability of § 365(n) arose as a result of the Debtor's rejection of the Agreement, which gave rise to a contested matter under Bankruptcy Rule 9014 and, therefore, the Debtor was not required to commence an adversary proceeding in order to obtain an adjudication of the 365(n) Motion.

### JURISDICTION

■ The Panel has jurisdiction to hear appeals from final judgments, orders, and decrees of the bankruptcy court. See 28 U.S.C. § 158(a)(1). In the bankruptcy context, an order is "final" if it completely resolves "all of the issues pertaining to a discrete dispute within the larger proceeding." Morse v. Rudler (In re Rudler), 576 F.3d 37, 43 (1st Cir. 2009) (quoting Perry v. First Citizens Fed. Credit Union (In re Perry), 391 F.3d 282, 285 (1st Cir. 2004)). The 365(n) Order resolved conclusively what rights were preserved by Mission's § 365(n) election in response to the Debtor's rejecting the Agreement and, therefore, it is final. Thus, the Panel has jurisdiction to hear this appeal. See In re Spansion, Inc., 507 Fed.Appx. 125, 127 (3d Cir. 2012) (considering appeal of bankruptcy court order determining creditor did not retain any rights pursuant to § 365(n) because the agreement between the parties was not a license); In re Exide Techs., 607 F.3d 957, 961 (3d Cir. 2010) (considering appeal of order holding agreement was executory contract and rejection of the agreement terminated creditor's rights under the agreement).

### STANDARD OF REVIEW

■ The Panel reviews a bankruptcy court's findings of fact for clear error and its conclusions of law de novo. Jeffrey P. White & Assocs., P.C. v. Fessenden (In re Wheaton), 547 B.R. 490, 496 (1st Cir. BAP 2016) (citation omitted). This appeal concerns the bankruptcy court's interpretation of the Agreement and the relevant provisions of the Bankruptcy Code—questions of law reviewed de novo. See OfficeMax, Inc. v. Levesque, 658 F.3d 94, 97 (1st Cir. 2011) ("Contract interpretation, when based on contractual language without resort to extrinsic evidence, is a 'question of law' that is reviewed de novo.") (citation omitted); Boston & Me. Corp. v. Mass. Bay Transp. Auth., 587 F.3d 89, 98 (1st Cir. 2009) ("[W]e review de novo issues of statutory interpretation . . . ."); United States v. Yellin (In re Weinstein), 272 F.3d 39, 42 (1st Cir. 2001) ("A question of the interpretation of the Bankruptcy Code, like any other question of statutory interpretation, is a question of law that we review de novo.") (citation omitted). "De novo review means that the appellate court is not bound by the bankruptcy court's view of the law." O'Rorke v. Porcaro, 545 B.R. 384, 394 (1st Cir. BAP 2016) (citation omitted) (internal quotations omitted).

### DISCUSSION

**I. Applicable Law**

Section 365(a) permits a trustee or debtor-in-possession, subject to court approval, to assume or reject any executory contract

of the debtor. The rejection of an executory contract constitutes a breach of the contract as of the bankruptcy petition filing date, entitling the counter-party to damages. 11 U.S.C. § 365(g). Section 365(n) allows a counter-party who is the licensee under an intellectual property license to elect to retain certain rights under the contract notwithstanding the debtor's rejection. It provides, in relevant part, as follows:

(n)(1) If the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect—

. . .

(B) to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced, for—

(i) the duration of such contract; and

(ii) any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.

(2) If the licensee elects to retain its rights, as described in paragraph (1)(B) of this subsection, under such contract—

(A) the trustee shall allow the licensee to exercise such rights;

(B) the licensee shall make all royalty payments due under such contract for the duration of such contract and for any period described in paragraph

(1)(B) of this subsection for which the licensee extends such contract; and

(C) the licensee shall be deemed to waive—

(i) any right of setoff it may have with respect to such contract under this title or applicable nonbankruptcy law; and

(ii) any claim allowable under section 503(b) of this title arising from the performance of such contract.

11 U.S.C. § 365(n)(1) & (2).

Section 365(n)(3)(B) provides:

If the licensee elects to retain its rights . . . then on the written request of the licensee the trustee shall . . . not interfere with the rights of the licensee as provided in such contract . . . to such intellectual property (including such embodiment) including any right to obtain such intellectual property (or such embodiment) from another entity.

11 U.S.C. § 365(n)(3)(B).

■ "Thus, in the event that a bankrupt licensor rejects an intellectual property license, § 365(n) allows a licensee to retain its licensed rights—along with its duties—absent any obligations owed by the debtor-licensor." In re Exide Techs., 607 F.3d at 966. Upon the licensee's election to retain its rights, the trustee or debtor-in-possession must allow the licensee to exercise those rights free from interference. 11 U.S.C. § 365(n)(2), (3).

Congress enacted § 365(n) in 1988 in response to the U.S. Court of Appeals for the Fourth Circuit's decision in Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1048 (4th Cir. 1985), in which the court held that rejection of an intellectual property license deprived the licensee of all rights previously granted under the license. Lubrizol was widely criticized and the legislative history of § 365(n) makes it clear that Congress intended to overrule it. See S. Rep. No.

100–505, 5 (1988), reprinted in 1988 U.S.C.C.A.N. 3201–3202. Lawmakers were concerned that technologists would respond to Lubrizol by insisting on outright assignments of intellectual property rather than agree to a licensing arrangement that could evaporate in the event of bankruptcy. Id. Seeing this as a threat to the system of licensing of intellectual property that had evolved in the United States, the Senate Report states that the purpose of § 365(n) was "to make clear that the rights of an intellectual property licensee to use the licensed property cannot be unilaterally cut off as a result of the rejection of the license pursuant to [§ ] 365 in the event of the licensor's bankruptcy." Id.

## II. Issues on Appeal

In the present case, it is undisputed that, due to its § 365(n) election, Mission retained its rights under the IP License granted to it in section 15 of the Agreement and could exercise those rights free from interference by the Debtor.

Mission argues, however, that the bankruptcy court committed reversible error: (1) by ruling that Mission's § 365(n) election applied only to the IP License and not to the exclusive product distribution rights granted in the Agreement; (2) by ruling that notwithstanding its § 365(n) election Mission did not retain any rights to use the Debtor's trademark and logo because those items are not included in the Bankruptcy Code's definition of "intellectual property"; and (3) by not requiring the Debtor to bring an adversary proceeding against Mission in order to obtain the relief sought in the 365(n) Motion.

### A. Whether the bankruptcy court erred in ruling that Mission's exclusive product distribution rights were not protected by its § 365(n) election.

█ Mission argues that its exclusive product distribution rights were preserved

as a result of its § 365(n) election because § 365(n) permits a licensee of intellectual property to retain its rights under the contract, "including a right to enforce *any* exclusivity provision of such contract" and "including any embodiment of such intellectual property." 11 U.S.C. § 365(n)(1)(B) (emphasis added). According to Mission, the Debtor's grant to Mission of exclusive rights to distribute Cooling Accessories in section 1 of the Agreement, and the Debtor's agreement in sections 5 and 6 not to license or sell Cooling Accessories to anyone else during the term of the Agreement, were "exclusivity provisions" and they related to the IP License because the Cooling Accessories were the "embodiment" of the Debtor's intellectual property. Thus, Mission contends, its § 365(n) election protected not only its non-exclusive IP License but also its exclusive product distribution rights.

█ As the bankruptcy court correctly observed, and the parties do not seriously dispute, an executory contract which may be subject to a § 365(n) election can contain terms and provisions unrelated to the licensing of intellectual property. Upon rejection of such a contract, the licensee's § 365(n) election applies only to its rights to intellectual property and not to any other rights that it might have received under the executory contract. To conclude otherwise would allow the narrow exception of § 365(n) to upend the very purpose of § 365. Any executory contract could be made "rejection proof" by inserting in it an intellectual property license no matter how remote or untethered the license provision was from the other terms of the agreement.

The Agreement here deals with far more than the licensing of intellectual property. As reflected in its title, "Co–

Marketing and Distribution Agreement," it confers on Mission the exclusive right to distribute the Debtor's products, namely its Cooling Accessories, in the United States and elsewhere around the world. Even a cursory reading of the Agreement makes it clear that the parties had two independent goals in entering into the Agreement: first, to grant Mission the right to distribute certain of the Debtor's products on an exclusive basis in a defined territory during a limited period; and second, to grant Mission a non-exclusive license to use some of the Debtor's intellectual property in perpetuity.

Mission also argues that the Debtor actually granted Mission two separate intellectual property licenses in the Agreement—the non-exclusive IP License provided in section 15 and an implied exclusive intellectual property license to defined products in a defined territory provided in sections 1, 5, 6, and 7 of the Agreement. According to Mission, the provisions by which the Debtor agreed that it would not interfere with Mission's product distribution rights in the Exclusive Territory and would refrain from selling or licensing the same products to third parties in that territory constituted the grant of an exclusive intellectual property license to Mission.

Mission's attempt to re-characterize its exclusive product distribution rights under the Agreement as an intellectual property license are unsupported by either the letter or the spirit of the Agreement. The product distribution provisions in sections 1, 5, 6, and 7 of the Agreement never use the terms license or intellectual property. They confer on Mission the exclusive right to sell certain of the Debtor's products in a defined territory and restrict the Debtor's ability to do the same, nothing more. These rights would have been viable and valuable even if the Agreement had not gone on to grant Mission the IP License.

Nor does the fact that the product distribution rights happen to be exclusive allow Mission's § 365(n) election to extend to those rights. The parenthetical reference in § 365(n)(1)(B) to "a right to enforce any exclusivity provision of such contract" refers "to such intellectual property." Thus, exclusivity provisions unrelated to an intellectual property license such as the exclusive product distribution rights in the Agreement are not protected by a § 365(n) election.

We conclude that the bankruptcy court did not err in ruling that the exclusive product distribution rights granted to Mission in the Agreement were unprotected by its § 365(n) election.

**B. Whether the bankruptcy court erred in ruling that Mission's rights in the Debtor's Coolcore trademark and logo were not protected by its § 365(n) election and, therefore, Mission did not retain any rights to the trademark and logo post-rejection.**

While the purpose of § 365(n) is to protect licensees of intellectual property, the section does not define the term "intellectual property." Section 101(35A) does. It provides:

The term "intellectual property" means—

> (A) trade secret;
>
> (B) invention, process, design, or plant protected under title 35 [relating to patents];
>
> (C) patent application;
>
> (D) plant variety;
>
> (E) work of authorship protected under title 17 [relating to copyrights]; or

(F) mask work protected under chapter 9 of title 17 [relating to microchips];

to the extent protected by applicable nonbankruptcy law.

11 U.S.C. § 101(35A). Conspicuously absent from the Code's definition are trademarks and trade names.[5]

After Congress enacted § 365(n), several courts directly addressed the issue of whether trademarks are protected under the statute. Some courts reasoned by negative inference that the omission of trademarks from § 101(35A) means that trademark licenses are not afforded any protection under § 365(n) and therefore electing licensees have no rights to use trademarks post-rejection. See, e.g., In re Old Carco LLC, 406 B.R. at 211 (holding that "[t]rademarks are not 'intellectual property' under the Bankruptcy Code" and, therefore, § 365(n) did not entitle licensees to retain their rights with respect to trademarks or to continue using them post-rejection); In re HQ Global Holdings, Inc., 290 B.R. 507, 513 (Bankr. D. Del. 2003) ("[S]ince the Bankruptcy Code does not include trademarks in its protected class of intellectual property, Lubrizol controls and the Franchisees' right to use the trademarks stops on rejection."); Raima UK Ltd. v. Centura Software Corp. (In re Centura Software Corp.), 281 B.R. 660, 674–75 (Bankr. N.D. Cal. 2002) ("Because § 365(n) plainly excludes trademarks, the court holds that [the licensee] is not entitled to retain any rights in [the licensed trademarks] under the rejected ... [t]rademark [a]greement.").

Other courts have expressed the view that reasoning by negative inference is inappropriate in the context of the rejection of trademark licenses and the scope of the § 365(n) election. See, e.g., In re Exide Techs., 607 F.3d at 966 (Ambro, J., concurring) ("I believe such reasoning [by negative inference] is inapt for trademark license rejections.");[6] In re Crumbs Bake

---

5. Congress considered addressing the omission of trademarks from § 101(35A) when it enacted § 365(n) but ultimately chose not to do so. The Senate Report noted:

> [T]he bill does not address the rejection of executory trademark, trade name or service mark licenses by debtor-licensors. While such rejection is of concern because of the interpretation of [§ ] 365 by the Lubrizol court and others, ... such contracts raise issues beyond the scope of this legislation. In particular, trademark, trade name and service mark licensing relationships depend to a large extent on control of the quality of the products or services sold by the licensee. Since these matters could not be addressed without more extensive study, it was determined to postpone congressional action in this area and to allow the development of equitable treatment of this situation by bankruptcy courts[.]

In re Crumbs Bake Shop, Inc., 522 B.R. at 771–72 (quoting S. Rep. No. 100–505, at 5, reprinted in 1988 U.S.C.C.A.N. 3204) (emphasis omitted).

6. In In re Exide Technologies, the Third Circuit held that a perpetual, exclusive, and royalty-free trademark license that was part of a larger, decade-old asset-purchase agreement pursuant to which the debtor had sold a certain business unit was not executory and, therefore, could not be rejected by the debtor. 607 F.3d at 963–64. In other words, the trademark license continued to exist because the debtor could not reject the contract. In his concurring opinion, Judge Thomas L. Ambro disagreed with the bankruptcy court's determination that rejection of the contract deprived the licensee of its right to use the trademark. Id. at 964–68. He considered the line of cases that concluded by negative inference that, because Congress did not include trademarks in the definition of intellectual property, it intended Lubrizol's holding to control when a debtor rejects a trademark license. Judge Ambro opined, however, that "it is 'simply more freight than negative inference will bear' to read rejection of a trademark license to effect the same result as termination of that license." Id. at 967. He contended that, even though rejection of a

Shop, Inc., 522 B.R. at 772. Courts applying this approach rely on the legislative history of § 365(n), concluding that "Congress intended the bankruptcy courts to exercise their equitable powers to decide, on a case[-]by[-]case basis, whether trademark licensees may retain the rights listed under § 365(n)." In re Crumbs Bake Shop, Inc., 522 B.R. at 772 (adopting rationale set forth by Judge Ambro in In re Exide Techs.). After considering the equities, the court in In re Crumbs Bake Shop, Inc. concluded that it would be inequitable to strip the trademark licensees of their rights under § 365(n) in the event of a rejection, as those rights were bargained away by the debtors.

> Courts may use § 365 to free a bankrupt trademark licensor from burdensome duties that hinder its reorganization. They should not ... use it to let a licensor take back trademark rights it bargained away. This makes bankruptcy more a sword than a shield, putting debtor-licensors in a catbird seat they often do not deserve.

Id. (quoting In re Exide Techs., 607 F.3d at 967–68).

In Sunbeam Products, Inc. v. Chicago American Manufacturing, LLC, 686 F.3d 372 (7th Cir. 2012), the U.S. Court of Appeals for the Seventh Circuit declined to follow either approach in its entirety. While the Seventh Circuit agreed that a § 365(n) election does not protect licensee rights in trademarks due to the omission of trademarks from the definition of intellectual property, it rejected both the line of authority embracing Lubrizol's holding that a trademark license is terminated upon rejection and the reasoning of Judge

Ambro that equitable principles could preserve a licensee's rights in trademarks post-rejection. Instead, the Seventh Circuit held that the debtor's rejection of a trademark license, which was part of a supply agreement that related to the manufacturing and sale of electric fans by a third party, did not automatically extinguish the licensee's right to use the debtor's trademarks. In response to cases such as In re Old Carco, LLC, supra, the court stated that "an omission is just an omission. The limited definition in § 101(35A) means that § 365(n) does not affect trademarks one way or the other." Id. at 375. The court examined the legislative history of § 365(n) and suggested that "the omission [of trademarks from the definition] was designed to allow more time for study, not to approve Lubrizol." Id. (citations omitted). It then rejected any equity-based attempt to circumvent the statutory omission, stating that "[r]ights depend ... on what the Code provides rather than on notions of equity." Id. at 376.

The Seventh Circuit determined it was more appropriate to focus on § 365(g), which sets forth the consequences of a rejection under § 365(a). Under § 365(g) "the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease ...." 11 U.S.C. § 365(g). By classifying rejection as a breach, § 365(g) establishes that in bankruptcy, as outside of it, the non-rejecting party's rights remain in place. Sunbeam, 686 F.3d at 377. Thus, rejection does not terminate the contract. Id. at 377–78. "[R]ejection is not the functional equivalent of a rescission [as Lubrizol suggests], rendering void the contract and requiring that the parties be put back in

---

contract would be a breach, rejection would not terminate the licensee's rights, and the licensee might still use a trademark even after rejection. Further, Judge Ambro maintained that, "[r]ather than reasoning from negative

inference to apply another Circuit's holding," the Third Circuit should have used its "equitable powers" to allow the licensee to continue using the debtor's trademark. Id. at 967.

the positions they occupied before the contract was formed .... It merely frees the estate from the obligation to perform and has absolutely no effect upon the contract's continued existence." Id. at 377 (citations omitted) (internal quotations omitted).

Here, the bankruptcy court, after considering both the negative inference and equity-based lines of authority, adopted the former.[7] The court, noting that § 101(35A) identifies six categories of intellectual property that are subject to protection under § 365(n), none of which includes trademarks, concluded:

> Under the maxim of *expressio unius est exclusio alterious* the expression of one thing is the exclusion of other things, see, e.g., United States v. Hernandez–Ferrer, 599 F.3d 63, 67–68 (1st Cir. 2010)[,] the omission of trademarks from the definition of intellectual property in § 101(35A) indicates that Congress did not intend for them to be treated the same as the six identified categories.

In re Tempnology, LLC, 541 B.R. at 8. Thus, the bankruptcy court ruled that Mission "does not retain rights to the Debtor's trademarks and logos post-rejection." Id.

Although Mission acknowledges that the definition of intellectual property in § 101(35A) does not encompass the Debtor's trademark and logo, it argues that the bankruptcy court should have used its equitable powers to determine that Mission's rights in the Debtor's trademark and logo were protected by § 365(n). According to Mission, the legislative history of § 365(n) makes it clear that the statute's failure to encompass trademarks within the definition of intellectual property protected upon rejection was intended, not to resurrect the draconian result in Lubrizol, but to allow courts to determine on a case-by-case basis whether trademark rights

should be preserved under § 365(n) on equitable grounds. Mission maintains, because the parties bargained for trademark rights under the Agreement, and because the Debtor's trademark and logo are inseparable from the Debtor's other intellectual property and the products themselves, that Mission's election to preserve its licensee rights should include its rights in the Debtor's trademark and logo.

The Debtor contends, however, that the bankruptcy court properly adopted the negative inference approach and that Lubrizol applies to the Debtor's trademark and logo. According to the Debtor, Congress unambiguously defined the types of intellectual property entitled to protection under § 365(n), and it did not include trademarks in any of the protected categories. The Debtor maintains that courts may not look to legislative history to interpret unambiguous statutes and because the statute here is clear, there is no need to look to the legislative history to understand the scope of § 365(n). Thus, the Debtor maintains, the bankruptcy court correctly held that § 365(n) does not apply to the Debtor's trademark and logo and, therefore, Mission does not have a "protectable interest in the Debtor's trademarks that survive[d] rejection...."

We agree that § 365(n) incorporates the definition of intellectual property set forth in § 101(35A), and that the definition does not encompass trademarks and logos. But we decline Mission's invitation to rule that, despite the omission of trademarks from the Code's definition of intellectual property, Mission's licensee rights in the Debtor's trademark and logo should be preserved under § 365(n) on equitable grounds as suggested in § 365(n)'s legislative history. "[C]ourts must presume that a legislature says in a statute what it

---

**7.** The bankruptcy court made no references to    the Sunbeam decision.

means and means in a statute what it says there." Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (collecting authorities). Thus, if a statute is unambiguous, the court need not resort to legislative history to construe its meaning. Moreover, "[w]hat the Bankruptcy Code provides, a judge cannot override by declaring that enforcement would be 'inequitable.'" Sunbeam, 686 F.3d at 375. While it is true that the legislative history expresses the sentiment that bankruptcy courts develop the "equitable treatment" of trademarks under § 365(n), we are not bound by Congress' aspirational asseverations.

██ We agree with the bankruptcy court that, based on a plain reading of the statute, Mission's rights in the Debtor's trademark and logo were not and could not be protected by its § 365(n) election. We must part company with the bankruptcy court, however, on the *effect* the Debtor's rejection of the Agreement had on Mission's licensee rights in the Debtor's trademark and logo. The bankruptcy court ruled that, because the Debtor's trademark and logo were not protected by Mission's election under § 365(n), Mission did "not retain rights to the Debtor's trademarks and logos post-rejection." This conclusion endorses Lubrizol's approach to the rejection of executory contracts, namely that rejection terminates the contract. Lubrizol, however, is not binding precedent in this circuit and, like the many others who have criticized its reasoning,[8]

we do not believe it articulates correctly the consequences of rejection of an executory contract under § 365(g). We adopt Sunbeam's interpretation of the effect of rejection of an executory contract under § 365 involving a trademark license.

What § 365(g) does by classifying rejection as breach is establish that in bankruptcy, as outside of it, the other party's rights remain in place. After rejecting a contract, a debtor is not subject to an order of specific performance. See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 531, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); Midway Motor Lodge of Elk Grove v. Innkeepers' Telemanagement & Equipment Corp., 54 F.3d 406, 407 (7th Cir. 1995). The debtor's unfulfilled obligations are converted to damages; when a debtor does not assume the contract before rejecting it, these damages are treated as a pre-petition obligation, which may be written down in common with other debts of the same class. But nothing about this process implies that any rights of the other contracting party have been vaporized.

Sunbeam, 686 F.3d at 377.

██ Applying Sunbeam's rationale, we conclude that, while the Debtor's trademark and logo were not encompassed in the categories of intellectual property entitled to special protections under § 365(n), the Debtor's rejection of the Agreement did not vaporize Mission's trademark rights under the Agreement. Whatever

---

8. See, e.g., In re Exide Techs., 607 F.3d at 966 (concurring opinion by Judge Ambro) (disagreeing with bankruptcy court's determination that Lubrizol and its progeny "'retain vitality'" as they relate to trademark licenses); In re Crumbs Bake Shop, Inc., 522 B.R. at 770 ("This Court is not persuaded by the decision in Lubrizol and is not alone in finding that its reasoning has been discredited.") (citing Sunbeam, 686 F.3d at 377–78). In addition, scholars uniformly criticize Lubrizol,

concluding that it confuses rejection with the use of an avoiding power. See, e.g., Douglas G. Baird, Elements of Bankruptcy 130–40 & n.10 (4th ed. 2006); Michael T. Andrew, Executory Contracts in Bankruptcy: Understanding "Rejection", 59 U. Colo. L. Rev. 845, 916–19 (1988); Jay Lawrence Westbrook, The Commission's Recommendations Concerning the Treatment of Bankruptcy Contracts, 5 Am. Bankr. Inst. L. Rev. 463, 470–72 (1997).

post-rejection rights Mission retained in the Debtor's trademark and logo are governed by the terms of the Agreement and applicable non-bankruptcy law.

Thus, we conclude that the bankruptcy court did not err in ruling that Mission's § 365(n) election failed to protect its rights under the Agreement as licensee of the Debtor's trademark and logo, but it erred in ruling that Mission's rights in the Debtor's trademark and logo as set forth in the Agreement terminated upon the Debtor's rejection of the Agreement.

**C. Whether the bankruptcy court erred in deciding the 365(n) Motion without requiring the Debtor to commence an adversary proceeding?**

■ Mission argues that the bankruptcy court committed error in deciding the 365(n) Motion without requiring the Debtor to commence an adversary proceeding under Bankruptcy Rule 7001. The bankruptcy court viewed the dispute as to the scope and applicability of § 365(n) in the context of the Debtor's motion to reject the Agreement, from which it arose, treating it is a contested matter under Bankruptcy Rule 9014.

Bankruptcy Rule 7001 requires an adversary proceeding in order, among other things, "to determine the validity, priority or extent of a lien or other interest in property" or for a declaratory judgment relating to the foregoing. Fed. R. Bankr. P. 7001(2) & (9). According to Mission, by its 365(n) Motion, the Debtor sought a declaratory judgment regarding the enforceability of Mission's rights, how those rights related to the rights of the Debtor (or the purchaser of the Debtor's assets), and the scope of the specific property to which Mission's rights attached. Thus, Mission contends, the Debtor was seeking a final determination of the extent of Mission's rights in certain property, including its rights to the Debtor's intellectual property, and the matter could only be adjudicated through an adversary proceeding.

In support, Mission cites In re Eastman Kodak Co., No. 12–10202, 2012 WL 2255719 (Bankr. S.D.N.Y. June 15, 2012), contending that the 365(n) Motion requested relief "that is nearly identical to the relief sought in In re Eastman Kodak ...." In that case, Eastman Kodak Company and certain affiliates planned to sell its digital imaging patents as part of its chapter 11 reorganization efforts. Two parties, Apple Inc. and FlashPoint Technology, Inc., disputed Kodak's ownership of ten digital imaging patents. Kodak filed a motion for an order in aid of the planned sale requesting a finding that Apple and FlashPoint had no ownership interests in the disputed patents and permitting a sale free and clear of their claims. Apple and FlashPoint objected, asserting, among other things, that the motion was procedurally improper because their ownership rights could not be determined summarily by motion. The bankruptcy court agreed, concluding the relief sought by Kodak was "for all intents and purposes, an action for a declaratory judgment to determine an interest in property by excluding the claimed interests of Apple and Flashpoint," and accordingly ruled that the matter had to be brought as an adversary proceeding, not as a contested motion. Id. at *2.

In contrast to the case before us, In re Eastman Kodak dealt with a dispute over ownership of property. Here, the dispute is over the scope of Mission's rights as a licensee of intellectual property in light of its election under § 365(n) after the Debtor rejected the contract giving rise to the license. Mission has never asserted ownership rights in the Debtor's property as

Apple and FlashPoint did in <u>In re East-man Kodak</u>.

Our case is more akin to <u>In re The Education Resources Institute, Inc.</u>, 442 B.R. 20 (Bankr. D. Mass. 2010). In that case, the debtor, The Education Resources Institute, Inc. ("TERI"), filed a "Motion for Interpretation of Order" asking the court to interpret an order authorizing the rejection of certain contracts with The First Marblehead Corporation. <u>Id.</u> at 21. TERI and First Marblehead disagreed about the implications of the court's order authorizing the rejection of certain contracts between the parties, including the parties' rights with respect to TERI's loan database. First Marblehead argued that the motion should be denied, because it sought declaratory and injunctive relief and therefore must be filed as an adversary proceeding under Bankruptcy Rule 7001. The bankruptcy court disagreed, noting:

> The Court agrees with First Marblehead that, to the extent TERI asks the Court to enjoin First Marblehead from doing anything or asks the Court to order First Marblehead to take a particular action, Rule 7001(7) requires the filing of an adversary proceeding.... But to the extent the motion asks the Court merely to interpret the Contracts Order, a request which *does* strike the Court as one for declaratory relief, an adversary proceeding is not required.... Standing alone, TERI's request for an interpretation of the Contracts Order is not related to any of the types of relief listed in subsections (1) through (8) of that Rule and may be brought by motion as a contested matter pursuant to Bankruptcy Rules 9013 and 9014.

<u>Id.</u> at 23–24 (citations omitted).

The bankruptcy court also noted First Marblehead would not be prejudiced by the procedure employed. The court observed:

> There are no factual issues in dispute requiring an extended discovery period or evidentiary hearing and both parties have had a fair opportunity to fully address the relevant legal issues. Accordingly, requiring the filing of an adversary proceeding at this juncture would provide nothing other than fruitless delay.

<u>Id.</u> at 24 (citing <u>In re NSCO, Inc.</u>, 427 B.R. 165, 176 n.12 (Bankr. D. Mass. 2010) (failure to file adversary proceeding excused where parties given fair opportunity to address issues in the context of a contested matter and no factual issues were in dispute); <u>Aegean Fare, Inc. v. Massachusetts (In re Aegean Fare, Inc.)</u>, 33 B.R. 745, 746 n.1 (Bankr. D. Mass. 1983) (failure to file adversary proceeding excused where issues were clearly delineated in motion and non-moving party was able to draft detailed response)).

In this case, the Debtor filed the 365(n) Motion seeking an interpretation of the bankruptcy court's order granting the Debtor's request to reject the Agreement, and the scope of Mission's retained rights after such rejection in light of its § 365(n) election, a request which may be interpreted as one for declaratory relief. The Debtor was not seeking a determination of the validity or extent of a lien or interest in property.

In any event, even if the 365(n) Motion should have been filed as an adversary proceeding, the bankruptcy court's failure to require the Debtor to do so was harmless error as there was no prejudice to Mission. Neither party expressed the need for or engaged in any discovery. Nor were there any facts in dispute. The parties were given ample opportunity to brief all issues and were given a full and fair hearing. Requiring the Debtor to file an adver-

sary proceeding would only have delayed resolution of the critical issues in dispute and added unnecessary expense on both sides.

In light of the foregoing, we conclude the bankruptcy court did not err in deciding the 365(n) Motion without requiring the Debtor to commence an adversary proceeding under Bankruptcy Rule 7001.

## CONCLUSION

For the reasons set forth above, we **AFFIRM IN PART** and **REVERSE IN PART**. We **REVERSE** the 365(n) Order to the extent the bankruptcy court ruled that Mission's rights in the Debtor's trademark and logo as set forth in the Agreement terminated upon the Debtor's rejection of the Agreement. We **AFFIRM** all other aspects of the 365(n) Order, including the bankruptcy court's ruling that Mission's § 365(n) election did not protect its rights under the Agreement as licensee of the Debtor's trademark and logo.

