# United States Court of Appeals
## For the First Circuit

No. 19-9004

IN RE:  OLD COLD, LLC,

Debtor.

MISSION PRODUCT HOLDINGS, INC.,

Appellant,

v.

SCHLEICHER & STEBBINS HOTELS, L.L.C.;
OLD COLD, LLC,

Appellees.

APPEAL FROM THE BANKRUPTCY APPELLATE PANEL
FOR THE FIRST CIRCUIT

Before

Howard, Chief Judge,
Selya and Kayatta, Circuit Judges.

Robert J. Keach, with whom Lindsay Z. Milne, Letson B. Douglass, and Bernstein, Shur, Sawyer & Nelson, P.A. were on brief, for appellant.
Christopher M. Candon, with whom Sheehan Phinney Bass & Green PA was on brief, for appellee Schleicher & Stebbins Hotels, L.L.C.

October 1, 2020

**KAYATTA**, **Circuit Judge**. On its third appeal before us in the bankruptcy proceedings of debtor Old Cold, LLC ("debtor"), creditor Mission Product Holdings, Inc. ("Mission") now challenges an order of the bankruptcy court granting creditor Schleicher & Stebbins Hotels, L.L.C. ("S & S") relief from the automatic stay imposed by section 362 of the Bankruptcy Code. See 11 U.S.C. § 362(a). In addition to challenging the stay relief order on its merits, Mission argues that the bankruptcy court lacked jurisdiction to issue the order because Mission's prior appeal of a bankruptcy court ruling was then still pending. Seeking to trump Mission's jurisdictional argument, S & S contends that any challenge to the bankruptcy court's order granting stay relief is moot because the debtor has disbursed all assets remaining in the estate to S & S. We reject both parties' jurisdictional arguments and affirm on the merits.

## I.

We have previously chronicled the long and tumultuous fight between Mission and S & S over the debtor's assets.[1] So we

_____

[1] See Mission Prod. Holdings, Inc. v. Tempnology, LLC, 139 S. Ct. 1652 (2019), rev'g 879 F.3d 389 (1st Cir. 2018), aff'g in part, rev'g in part 559 B.R. 809 (B.A.P. 1st Cir. 2016), aff'g in part, rev'g in part 541 B.R. 1 (Bankr. D.N.H. 2015); Mission Prod. Holdings, Inc. v. Old Cold, LLC (In re Old Cold, LLC), 879 F.3d 376 (1st Cir. 2018), aff'g 558 B.R. 500 (B.A.P. 1st Cir. 2016), aff'g 542 B.R. 50 (Bankr. D.N.H. 2015); Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C. (In re Old Cold, LLC), 602 B.R. 798 (B.A.P. 1st Cir. 2019).

- 2 -

repeat as succinctly as possible only those facts key to this appeal.

**A.**

In 2012, the debtor granted Mission exclusive and non-exclusive licenses to use and distribute several of its intellectual property assets (the "Agreement"). When the parties' relationship soured, Mission exercised its contractual right to terminate the Agreement, triggering a provision calling for a two-year wind-down period. Hoping to end any wind-down sooner, the debtor sought to terminate the contract immediately by claiming Mission had breached the Agreement. The parties entered arbitration over that dispute, with the arbitrator ruling in favor of Mission as to liability but making no findings with respect to damages due to the intervening filing of the debtor's Chapter 11 petition.

**B.**

In its petition for Chapter 11 bankruptcy, the debtor listed S & S as the only secured creditor, with a $5.55 million claim of pre-petition advances stemming from credit extended prior to the bankruptcy filing. The debtor listed Mission as an unsecured creditor, with a contingent, unliquidated, and disputed claim, and an executory contract.

Shortly after filing for Chapter 11 protection, the debtor moved for debtor-in-possession financing from S & S. The

bankruptcy court granted this motion in a series of orders, with its final order allowing up to $1.45 million in post-petition financing, secured by a first-priority perfected lien on the debtor's estate. As part of this final order, the court confirmed the "validity, extent, perfection or priority of [S & S's] security interests" and pre-petition liens of $5.5 million, with the order itself perfecting the $1.45 million post-petition amount. The court also set November 12, 2015 (pre-petition), and December 31, 2015 (post-petition), as deadlines for any challenges to these lien-validity findings. Those deadlines passed with neither Mission nor any other party lodging any objection.

## c.

The debtor also sought to reject the Agreement with Mission under the terms of the Bankruptcy Code. The bankruptcy court granted the request "subject to [Mission's] election to preserve its rights under [ ] § 365(n)" of the Bankruptcy Code. Clarifying the extent of these section 365(n) rights, the bankruptcy court stated that Mission's non-exclusive intellectual property license survived the rejection but that Mission's exclusive distribution rights and trademark license did not. In re Tempnology, LLC, 541 B.R. 1, 6-7 (Bankr. D.N.H. 2015). We affirmed. Mission Prod. Holdings, Inc. v. Tempnology, LLC (In re Tempnology, LLC), 879 F.3d 389, 405 (1st Cir. 2018).

- 4 -

On June 11, 2018 (the same day that S & S filed the currently-at-issue motion for relief from the automatic stay), Mission petitioned the Supreme Court for a writ of certiorari seeking review of our affirmance. The Supreme Court granted the petition in part on October 26, 2018 (a month after the bankruptcy court granted the sought-after stay relief but before the relief order took effect), to answer the following question: "Whether, under § 365 of the Bankruptcy Code, a debtor-licensor's 'rejection' of a license agreement -— which 'constitutes a breach of such contract,' 11 U.S.C. § 365(g) -— terminates rights of the licensee that would survive the licensor's breach under applicable non-bankruptcy law." See Petition for a Writ of Certiorari at i, Mission Prod. Holdings, Inc. v. Tempnology, LLC, 139 S. Ct. 397 (2018) (No. 17-1657) (mem.). On May 20, 2019, the Supreme Court reversed our ruling, holding that

> under Section 365, a debtor's rejection of an executory contract in bankruptcy has the same effect as a breach outside bankruptcy. Such an act cannot rescind rights that the contract previously granted. Here, that construction of Section 365 means that the debtor-licensor's rejection cannot revoke the trademark license.

Mission Prod. Holdings, Inc. v. Tempnology, LLC, 139 S. Ct. 1652, 1666 (2019).

**D.**

While Mission and S & S did battle, the debtor moved to sell all its assets at auction pursuant to 11 U.S.C. § 363. The bankruptcy court appointed an examiner and approved the sale motion in September and October 2015, respectively. S & S agreed to be a stalking horse bidder, and the bankruptcy court authorized S & S to credit bid "up to and including the post-petition amounts loaned to" the debtor and "an additional $5,650,000" as listed on the debtor's Schedule D.

The auction took place on November 5, 2015. In its first bid, Mission included $200,000 of debtor cash as some sort of supposed consideration for the sale, stating that the bid would "leave $200,000 worth of cash in the debtor" and that "[Mission is] leaving $[200,000] of the cash [it was] otherwise . . . going to buy in the debtor." In an effort to bid similarly to Mission, S & S also began to demand fewer than all of the debtor's assets, with the debtor's counsel describing S & S's bid as "strik[ing] the provisions of the . . . acquired assets, similar to those struck by Mission" and thereby "leav[ing] back" or "leav[ing] behind" various estate assets. As a result, both parties' final bids left behind in the estate an identical subset of debtor assets, worth approximately $800,000 (the debtor's inventory, its accounts receivable, and $600,000 of cash). Perhaps seeking to clarify each other's view regarding the precise treatment of these

debtor assets post-auction, the following exchange took place between the debtor's counsel (Desiderio) and Mission's counsel (Keach):

> MR. KEACH: So [S & S is] leaving $800,000 of assets in the estate. The estate gets to liquidate those and keep the money?
> MR. DESIDERIO: It's more than that. They're leaving—
> MR. KEACH: Well, if it was 800 for us, it's going to be 800 for them.
> MR. DESIDERIO: . . . Yes. That's right. Which means we value [S & S]'s last bid at $2,257,000.

Eventually, S & S incrementally increased its credit bid beyond an amount Mission was willing to contribute in cash and won the auction.

Mission objected to the sale procedures and final determination that S & S had fairly won. It argued that the debtor miscalculated S & S's bid; that the auction was conducted in bad faith; and that S & S should not have been able to credit bid as much as it did because much of that credit was in fact equity. After the Examiner entered a report determining that the valuation was fair and the transaction arms-length, the bankruptcy court, after a two-day evidentiary hearing, entered a sale order approving the sale of the debtor's assets to S & S pursuant to an Asset Purchase Agreement between the two parties (APA). In re Tempnology, LLC, 542 B.R. 50 (Bankr. D.N.H. 2015). The bankruptcy court rejected Mission's arguments, concluding that S & S was

entitled to credit bid in the amount that it did because the secured claim listed on the debtor's schedule D was not subject to a bona fide dispute, as Mission had never previously disputed the secured claim.  Id. at 68-70.  The court similarly refused either to treat these claims as equity or find that S & S was not a good faith purchaser.  The court also found no collusion between the debtor and S & S, and that the auction was otherwise fair.  Id. at 70-72.

The APA memorializing the sale distinguishes between two sets of debtor assets resulting from the sale:  the Acquired Assets and the Excluded Assets.  The former included, free and clear of all encumbrances, all of the debtor's assets save the Excluded Assets, which were specifically identified as such in the APA.  As is customary in a transaction liquidating a debtor's assets, the sale proceeds received by the debtor on the sale became subject to all encumbrances that had been attached to the Acquired Assets. We found a challenge to the entry of the sale order moot.  Mission Prod. Holdings, Inc. v. Tempnology, LLC (In re Old Cold LLC), 879 F.3d 376, 389 (1st Cir. 2018).

As to the left-behind Excluded Assets, neither the APA nor the sale order purported to change in any way the status or treatment of those assets, all of which had long been subject to S & S's lien. The APA simply omitted the Excluded Assets from the valuation of the bid, instead calculating only the dollar value

given for the Acquired Assets, presumably on the assumption that, because both S & S's and Mission's final bids included exactly the same list of Excluded Assets, the precise valuation of those assets was irrelevant to the ordinal ranking of each bid.

In February 2016, S & S sought to acquire one of those Excluded Assets, the debtor's inventory, free and clear of its liens, with the liens attaching to the proceeds of this second sale. Mission challenged this proposed inventory sale, but it did not dispute that the assets were subject to S & S's liens. Rather, it challenged S & S's assertion that its intellectual property rights restricted any other party from acquiring this inventory, arguing that such a restriction would contradict the terms of the APA (allowing the sale of these assets by the debtor to achieve the highest value) and would evidence collusion between S & S and the debtor. The bankruptcy court agreed with Mission that such an IP restriction would have rendered the terms of the auction suspect but approved the inventory sale, concluding that the price (accounting cost) was fair and that the sale of the inventory to S & S does not contradict the APA as long as the debtor would have been free to sell the inventory to any party, which it had unsuccessfully sought to do.

**E.**

With that history in mind, we turn to the motion on appeal. On June 11, 2018, S & S filed a motion for relief from

the automatic stay imposed in bankruptcy proceedings under 11 U.S.C. § 362(a), to which the debtor assented. S & S claimed that it had valid, first-priority, perfected liens exceeding $5 million on the debtor's assets, and that the only remaining property in the estate was $527,292 in cash (the proceeds of the aforementioned inventory sale). It thus argued that the debtor lacked equity in the remaining property and, because the debtor had assented to the motion, that the property was not needed to effect a reorganization. See id. § 362(d)(2).

Mission objected. First, it argued that the then-pending petition for a writ of certiorari divested the bankruptcy court of jurisdiction to decide the stay relief motion because, if stay relief were granted, S & S would be able to strip the estate of assets that could be used to satisfy any judgment that might flow from Mission's appeal in the event the Supreme Court were to side with Mission. Second, it argued that S & S no longer had a security interest in that property because, as part of the auction and sale, S & S had supposedly agreed either to recontribute those assets back into the estate free and clear of its liens or to waive those liens as part of the bidding process. Mission also stated that it wished for limited discovery into how the non-lawyer principals viewed the Excluded Assets after the auction, arguing that this might show that the debtor and/or S & S believed them to be unencumbered.

After a preliminary hearing, the bankruptcy court asked for supplemental briefing on whether S & S retained its liens on the remaining assets.  Mission argued that "the assets were unencumbered because the Debtor said so at the Auction, S & S was silent, and the entire sale (and appellate) process proceeded on that mutual belief" and that "the bid values asserted at the Auction and found at the Sale Hearing dictated that the Recontributed Assets were unencumbered."

After a hearing on September 18, 2018, the bankruptcy court granted the stay relief motion.  As to Mission's jurisdictional argument, the court concluded that the "practical concern" that there may be no assets left in the estate to satisfy a possible administrative claim resulting from the Supreme Court appeal did not divest the bankruptcy court of jurisdiction "to decide an issue that is not the subject of a pending appeal."  It also refused Mission's request for limited discovery, noting that stay relief motions are "summary proceedings" and "there are not sufficient issues of fact that would bear on the determination of the motion."

The bankruptcy court also rejected Mission's assertion that S & S's liens were somehow no longer valid.  First, it noted that there was no dispute that the liens were valid right before the auction.  Second, it reviewed the auction transcript, beginning with Mission's bid proposing to "leave behind" certain assets,

which proposal S & S ultimately matched. The bankruptcy court pointed out that there was no discussion of how Mission could conceivably extricate any left-behind assets from the liens attached to those assets. Hence, there was no reason to think that S & S, in matching Mission's bid, proposed to undertake such a gratuitous elimination of its own liens. Because the liens were valid before the auction and there was no evidence that anything happened to them at the auction, the bankruptcy court concluded that S & S had met its burden of showing that there was no equity in the property and, because the debtor assented to the motion, the property was not necessary for an effective reorganization.

Mission sought a stay of this order from the bankruptcy court pending its appeal (electing to go to the Bankruptcy Appellate Panel (BAP), see 28 U.S.C. § 158), which the bankruptcy court granted in part, extending to November 28, 2018, Federal Rule of Bankruptcy Procedure 4001's automatic fourteen-day stay of such orders so that Mission could seek a further stay of the relief order from the BAP. On November 27, 2018, the BAP denied Mission's request for a further stay, concluding that Mission had shown neither a likelihood of success on the merits nor irreparable injury absent relief, so the stay relief order took effect. The next day, S & S demanded the remaining cash from the debtor, and the debtor complied. The BAP then affirmed the bankruptcy court, concluding that both it and the bankruptcy court had jurisdiction

and that the bankruptcy court did not abuse its discretion in granting S & S's motion for relief allowing it to foreclose on its liens in the debtor's remaining cash.  Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C. (In re Old Cold, LLC), 602 B.R. 798, 831 (B.A.P. 1st Cir. 2019).  Mission appealed.

## II.

### A.

We begin by deciding whether Mission's failure to obtain a stay of the relief order and the subsequent disbursement of the debtor's remaining assets have rendered this appeal moot. Presenting what seems to be a hybrid of Article III, equitable, and 11 U.S.C. § 363(m) theories of mootness, S & S contends that we can neither order disgorgement of these funds nor grant Mission any other form of relief, even were we to decide the appeal in Mission's favor.  In support, S & S relies principally upon Soares v. Brockton Credit Union, where we held that "when the debtor fails to obtain a stay pending appeal of the bankruptcy court's . . . order setting aside an automatic stay and allowing a creditor to foreclose on property, the subsequent foreclosure and sale of the property renders moot any appeal."  187 F.3d 623 (1st Cir. 1998) (per curiam) (table), 1998 WL 1085827 (quoting Matos v. Matos (In re Matos), 790 F.2d 864, 865 (11th Cir. 1986)).  In S & S's view, this rule applies here even though the purchaser of the assets is the creditor who is a party to the appeal, citing Greylock Glen

- 13 -

Corp. v. Community Savings Bank, 656 F.2d 1, 4-5 (1st Cir. 1981), and where the asset is only cash.  The BAP thought otherwise.

We agree with the BAP that the disbursement of the funds to S & S did not moot this appeal.  Every case cited by S & S involved a subsequent foreclosure and sale of property by the creditor, not a mere disbursement of cash.[2]  But "[u]nlike other assets . . . (e.g. real property, conveyances), cash is a fungible item."  United States v. $46,588.00 in U.S. Currency & $20.00 in Canadian Currency, 103 F.3d 902, 904 n.5 (9th Cir. 1996) (quoting Attorney General Policy Directive 87-1 (Mar. 13, 1987)) (holding that the comingling of the cash in question with other cash did not deprive the court of jurisdiction).  Even under the less stringent doctrine of equitable mootness (the applicability of which to stay relief orders we need not decide), the failure to obtain a stay pending appeal, by itself, does not provide

---

[2]  See 255 Park Plaza Assocs. Ltd. P'ship v. Conn. Gen. Life Ins. Co. (In re 255 Park Plaza Assocs. Ltd. P'ship), 100 F.3d 1214, 1216 (6th Cir. 1996) (concluding moot where a lack of a stay "permits a sale of a debtor's assets"); Oakville Dev. Corp. v. FDIC, 986 F.2d 611, 613 (1st Cir. 1993) (holding the same for a foreclosure sale as well as noting the constitutional aspects of the mootness issue); Miami Ctr. Ltd. P'ship v. Bank of N.Y., 838 F.2d 1547, 1550 (11th Cir. 1988)(conveyance of real property title to a land trust); Egbert Dev., LLC v. Cmty. First Nat'l Bank (In re Egbert Dev., LLC), 219 B.R. 903, 905-06 (B.A.P. 10th Cir. 1998) (finding moot where "the moving creditor subsequently conducts a foreclosure sale"); Boudreau v. U.S. Bank Tr., N.A. (In re Boudreau), No. 61-cv-10747, 2017 WL 740993, *2-3 (D. Mass. Feb. 24, 2017) (holding the foreclosure sale of home rendered an appeal moot).

"sufficient ground for a finding of mootness."  Rochman v. Ne. Utils. Serv. Grp. (In re Pub. Serv. Co. of N.H.), 963 F.2d 469, 473 (1st Cir. 1992).  Rather, such mootness requires "the challenged bankruptcy court order [to have] been implemented to the degree that meaningful appellate relief is no longer practicable."  Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.), 136 F.3d 45, 48 (1st Cir. 1998).  In contrast to a case where we are unable to return title to the estate because it has been transferred to a good faith purchaser, we simply cannot say that ordering a party on appeal to disgorge mere cash is impracticable and does not afford meaningful appellate relief. See Spirtos v. Moreno (In re Spirtos), 992 F.2d 1004, 1006–07 (9th Cir. 1993) (finding no mootness where the creditor "stripped the plans of their assets" but there was no foreclosure or sale and the receiving party was a party to the appeal and knew of the appeal at time it took that action, as the court could fashion relief by ordering the money returned to the estate); Salomon v. Logan (In re Int'l Envtl. Dynamics, Inc.), 718 F.2d 322, 326 (9th Cir. 1983) (holding the court could fashion relief where there were simply "erroneously disbursed funds").

S & S points out that a real property transfer can also be unwound in theory if the property is still in the hands of the original transferee, who is a party to the appeal, yet we still treat such a transaction as irrevocable, mooting a post-transfer

- 15 -

challenge.  See Greylock, 656 F.2d at 3-4.  But we recognized in so holding that such a real property transferee was "entitled to bid upon the [foreclosed] property with the assurance that its title to the property would not be affected by appellate review months or even years later," just like any other potential buyer. Id. at 4.  That holding depended on the text of former Bankruptcy Rule 805, which did not distinguish between a mortgage holder and any other potential purchaser who acquired the property in good faith.  Id.  But that rule, and its modern equivalents, are not at issue where there is no judicial sale order or an actual "purchase[r]" relying on that order.  See 11 U.S.C. §§ 363(m), 364(c).  So there is no risk of undermining "the integrity of the judicial sale process upon which good faith purchasers rel[y]." Miami Ctr. Ltd. P'ship v. Bank of N.Y., 838 F.2d 1547, 1553, 1555-56 (11th Cir. 1988) (quoting Markstein v. Massey Assocs., Ltd., 763 F.2d 1325, 1327 (11th Cir. 1985)) (discussing the complicated reliance interests the court would be disturbing were it to unwind aspects of a real estate transfer even to a designee of the creditor-appellee).  In short, Greylock is distinguishable, and we find no similar text or policy interests that warrant extending its holding to the present facts.

Moreover, the Supreme Court rejected the argument that the disbursement of the remaining cash from the estate mooted its consideration of the § 365(n) appeal, noting that, if successful,

Mission "can seek the unwinding of prior distributions to get its fair share of the estate." Mission Prod. Holdings, Inc., 139 S. Ct. at 1661. It would be inconsistent to now hold that any such relief is so implausible as to preclude our review of this order. Accordingly, we find no basis to conclude this appeal is equitably moot, moot under Article III, or moot under the provisions of the Bankruptcy Code and rules.

**B.**

Having concluded that Mission's appeal is not moot, we next answer whether the granting of Mission's petition for a writ of certiorari divested the bankruptcy court of jurisdiction to decide the stay relief motion. We review de novo a determination regarding jurisdiction under the divestiture rule. United States v. Rodríguez-Rosado, 909 F.3d 472, 477 (1st Cir. 2018). On appeal, we look through the BAP's holding and review the bankruptcy court's decision directly. PC P.R., LLC v. Empresas Martínez Valentín Corp. (In re Empresas Martínez Valentín Corp.), 948 F.3d 448, 455 n.6 (1st Cir. 2020) (citing DeMore v. Lassman (In re DeMore), 844 F.3d 292, 296 (1st Cir. 2016)).

Mission argues that the stripping of assets from the debtor's estate sought by the stay relief motion deprived Mission of the same assets to which it would have looked in satisfaction of the claim it was pursuing on appeal. In Mission's view, this purported relatedness between S & S's claim for stay relief and

Mission's claim for breach of the agreement caused the lower court to lose jurisdiction to make that determination. Mission relies primarily on Whispering Pines Ests., Inc. v. Flash Island, Inc. (In re Whispering Pines Ests., Inc.), where the BAP held that the bankruptcy court was divested of jurisdiction to grant stay relief because the foreclosure of the property at issue in the stay relief motion "directly implicated the matter under the appeal," namely, the appropriateness of a "[p]lan providing for the sale of the Property." 369 B.R. 752, 75960 (B.A.P. 1st Cir. 2007).

As we have just discussed, though, if S & S had no right to the assets, we could order a disgorgement in this case. And the Supreme Court recognized that the disbursement of the cash had no impact on its ability to decide Mission's appeal as long as there was "any chance of money changing hands." Mission Prod. Holdings, 139 S. Ct. at 1660. In Whispering Pines, possible confusion could have occurred with a competing equitable order requiring the disposal of a specific piece of property through a different mechanism than the appeal specifically provided for, thus interfering with the rights determined in the appeal. 369 B.R. at 759. We discern no similar possibility of confusion here, where the appeal concerned only the merits, rather than the priority of Mission's claim against the debtor. The bankruptcy court's determination that any claim by Mission would be junior to S & S's claim as a secured creditor therefore did not take away

- 18 -

any benefit that the Supreme Court appeal might purport to grant Mission. Simply put, contrary to Mission's assertion that the stay relief order would "impermissibly interfere with the rights on appeal," we find no such interference.

## C.

We now turn to the merits of Mission's challenge to the bankruptcy court's order granting S & S the requested relief from the automatic stay. Such orders are generally reviewed for an abuse of discretion. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 814 F.2d 844 (1st Cir. 1987). The bankruptcy court's discretion was limited, though, by two preliminary requirements. First, S & S must show a "colorable claim to property of the estate." Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 32 (1st Cir. 1994) (citing 11 U.S.C. § 362). Second, the amount of this lien, if valid, must "exceed[] the value of the property" in question. In re Vitreous Steel Prod. Co., 911 F.2d 1223, 1234 (7th Cir. 1990). In making these findings, the bankruptcy court was free to consider "any defenses or counterclaims that bear on" the likelihood of the existence of the creditor's claimed interest in the property. Grella, 42 F.3d at 34. We review any factual findings for clear error. Fin.

Oversight & Mgmt. Bd. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd.), 899 F.3d 13, 23 (1st Cir. 2018).

### 1.

Mission does not dispute that prior to the auction the debtor had no equity in its property because all of that property was subject to liens that exceeded the property's value. Mission's principal argument that relief from the automatic stay was improper instead hinges on the assertion that, by entering into the APA without buying all of the debtor's property, S & S implicitly surrendered its liens on that property. This implication arises, Mission says, from the discussion at the auction of a commitment to match Mission's treatment of some debtor assets by leaving them back or leaving them behind in the estate.[3]

Waiver is a potential defense that the bankruptcy court may consider in deciding whether the creditor has a colorable interest in the property that is the subject of a stay relief motion. United States v. Fleet Bank of Mass. (In re Calore Express Co.), 288 F.3d 22, 35 (1st Cir. 2002) (citing Grella, 42 F.3d at 35) (noting that, although a stay relief hearing is not the proper time for a determination of many substantive rights, the bankruptcy

---

[3] Mission does not contend on appeal that S & S "recontributed" assets to the estate. Rather, it asserts that it would have recontributed the Excluded Assets had it won the auction, and S & S matched this bid structure by agreeing to waive its liens.

court may "consider" issues of waiver in deciding whether to grant relief, as a "waived [claim] is no longer colorable").  Neither S & S's successful bid, the APA, nor the order approving the sale, though, contain any reference to such a waiver or release of any lien, so Mission asks us to imply the presence of one.

Mission points to the fact that, early in the auction, it increased its bid by "leav[ing] $200,000 worth of cash in the debtor."[4]  Mission says we should assume that its bid, if accepted, would have left those assets in the debtor free and clear of any liens, citing 11 U.S.C. § 363(f).  To be sure, Mission's bid itself said no such thing.  So Mission argues that it did say that it was leaving the assets "for the estate to liquidate and keep and distribute to other creditors."  But that statement says nothing about which creditors are to receive the assets that are left behind.

More fundamentally, the unstated premise of Mission's argument -- that Mission had the power to eliminate S & S's liens on the debtor's assets merely by agreeing to leave the assets in the estate -- makes no sense.  Were that premise correct, many section 363(f) sales would turn into lien laundries.  In such a laundry, a debtor could sell at auction a truck -- in which Party A

---

[4]  Alternatively, Mission said it was "buy[ing] $200,000 less cash."  Mission eventually increased the assets left in the estate to include $600,000 cash, the debtor's inventory, and the debtor's accounts receivable.  S & S's final bid left in the same assets.

- 21 -

has a security interest -- to Party B for $1 plus leaving the truck itself in the debtor's estate, with Party B perhaps keeping the rearview mirror for itself. Then, with nary a word of consent from Party A, the rest of the truck would no longer be subject to Party A's security interest. Mission provides no caselaw to justify such alchemy. The Bankruptcy Code itself plainly protects a security interest even when the assets to which the interests attach are sold in a section 363(f) sale, 11 U.S.C. § 363(e), which often means that those security "interests attach to the proceeds of the sale," H.R. Rep. No. 95-595, at 345 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6302; S. Rep. No. 95-989, at 56 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5842.[5] It would be strange indeed to conclude that an auction that did not even result in the sale of that same asset would somehow destroy the security interest. Mission therefore tries to classify the assets it would have "recontributed" as neither proceeds of the sale to which the

[5] See Rosemary E. Williams, Annotation, Special Commentary: Sales of Property, Other than in Ordinary Course of Business, of Bankruptcy Estate Free and Clear of Consensual and Nonconsensual Liens, Claims, and Encumbrances Under § 363(f) of Bankruptcy Code of 1978 (11 U.S.C.A. § 363(f)),22 A.L.R. Fed. 2d 579 (Originally published in 2007) (collecting cases) ("While a bankruptcy estate is required to provide 'adequate protection' to the interests of lienholders, in the context of a sale free and clear of liens, the undisputed practice is to state in the sale notice and motion that all liens, claims, and encumbrances will attach to the sale proceeds without requiring any determination of their validity, priority, or interest concurrently with the sale, thus meeting the requirement of adequate protection in this context.").

liens would attach nor undisturbed assets that were not sold free and clear of the liens, but rather as something else. But it offers no explanation as to how such a sale would provide adequate protection to a secured creditor. And if Mission's bid did not eliminate any liens, there is no reason that any match of that bid would do so.

Bereft of support for such an asset reclassification, Mission argues that a lien waiver was necessarily implicit in the economics of the bids because both Mission and S & S received credit for the value of the assets to be left behind. But if two parties are bidding and each bids the same dozen apples, it matters not how we value those apples. Moreover, a bid for $100 that leaves behind $10 worth of apples is indeed worth more ($110) than a bid for $100 that takes all the apples ($100). And we determine that worth by looking at the value of the final package to the estate, which at that auction stage is agnostic regarding which creditor ends up getting what share of the $110. That S & S was first in line (and likely knew that it would be unless its liens were recharacterized as equity) does not change the fact that the bid maximized the value to the estate.

Even if we were to assume that Mission had come up with a novel argument that would support the claim that a bidder could wash assets clean of liens in this manner, there is no reason at all to assume that S & S intended such an effect as implicit in

- 23 -

its bid.  Waiver of a first secured lien on cash is no small matter -- hardly something that would be offered only on an implication so tenuous as that claimed by Mission.  See In re Calore Express Co., 288 F.3d at 39 (noting that courts rarely "imply waiver from mere silence").  In fact, New Hampshire law requires an action or agreement inconsistent with the existence of the lien to find such a waiver.  City of Portsmouth v. Nash, 493 A.2d 1163, 1165 (N.H. 1985).[6]  The debtor's counsel agreeing with a mere ambiguous statement at the auction -- "[t]he estate gets to liquidate those [assets] and keep the money" -- that is grammatically and logically consistent with S & S retaining its liens does not suffice.

The Examiner -- whose role was to investigate "the amount, validity and priority of [S & S's] claims and liens" and "to prepare and file with the Court a report with regard to the sale process" -- saw no such implicit waiver.  He wrote:

> The structure of the bid means that immediately after closing there are substantial assets left for creditors the largest of which is inventory.  The assets left are available to satisfy the remaining claim of Mission if Mission is correct that all of the pre-petition [S & S] debt should be re-characterized as equity.  If Mission is incorrect and the [S & S] pre-petition debt may not be re-characterized as equity then the [S & S] security interest reaches all of those assets.

---

    [6]  The BAP noted that New Hampshire law governs the debtor's loan agreements with S & S, and neither party contends otherwise.

- 24 -

He further noted three possible characterizations of the estate following the sale: (1) S & S's claim is not recharacterized as equity and thus remains fully secured, (2) S & S's claim is recharacterized as equity and Mission has an unsecured claim, and (3) S & S's claim is recharacterized as equity and Mission has an administrative claim. The report mentions no possibility that S & S's claims are not equity but its liens were otherwise waived. Even Mission's own counsel seemed to discern no such waiver by S & S, stating that if Mission had won the auction, S & S would "have claims to whatever the proceeds are," focusing its effort on recharacterizing S & S's claims as equity and not objecting to the Examiner's report or the proposed sale on these grounds. Nor did the experienced bankruptcy judge make mention of any such lien waiver in either his sale order or the accompanying memorandum.[7]

Mission finally contends that some of the debtor's filings describing its cash as "unrestricted" and referring to sale proceeds being distributed in a "waterfall" imply that its cash was somehow not subject to any lien. Given the overwhelming

_____

[7] Contrary to Mission's assertion, the bankruptcy court also did not somehow inappropriately shift the burden to Mission to show the liens were not valid. It recognized that S & S had the burden of proving its interest in the property. And it found that S & S produced clear documentary evidence from the court records that its liens were valid prior to the auction and successfully demonstrated that nothing that took place during the bidding process of the auction changed that status. We therefore need not decide whether the absence of a waiver is something a creditor seeking relief from stay bears the burden of proving in all cases.

evidence that all of debtor's assets were subject to S & S's liens, we find S & S's failure to discern and challenge those arguable inferences in what the debtor said provided no basis for deeming S & S to have miraculously and for no reason waived its liens. See In re Calore Express Co., 288 F.3d at 39. In sum, the argument that S & S waived its liens is poppycock.

## 2.

Mission next argues that S & S (which had the burden of proof) failed to meet the quantum of proof necessary to warrant relief from the automatic stay. Mission argues that the proper standard for such a motion is for S & S to establish by a preponderance of the evidence the validity and extent of its liens. But, as we have explained, there was no question that S & S possessed valid liens in excess of the value of the debtor's remaining. So for that reason alone S & S certainly established the "colorable claim to property of the estate" needed to obtain relief from the stay. Grella, 42 F.3d at 33.

## 3.

Finally, leaving no pebble unturned, Mission assigns procedural error, claiming that under the Bankruptcy Code and rules it was entitled to limited discovery and an evidentiary hearing before the bankruptcy court could decide the stay relief motion, which is a contested matter. The bankruptcy rules do state that various applicable civil rules and discovery "rules shall apply"

in contested matters -- "<u>unless the court directs otherwise</u>." Fed. R. Bankr. P. 9014(c) (emphasis added) (citing Fed. R. Bankr. P. 7026, which incorporates the discovery provisions of Civil Rule 26). We therefore review a decision to limit the applicability of these rules and to not grant discovery and a full evidentiary hearing for an abuse of discretion. <u>See</u> <u>In re Stavriotis</u>, 977 F.2d 1202, 1204 (7th Cir. 1992); <u>Pub. Serv. Co. of N.H.</u> v. <u>Hudson Light & Power Dep't</u>, 938 F.2d 338, 346 (1st Cir. 1991) (reviewing a denial of a Rule 56 discovery motion incorporated by Rule 9014 for an abuse of discretion).

The United States Bankruptcy Court for the District of New Hampshire has a standing local rule that "Bankruptcy Rule 7026 and LBR 7026-1 shall not apply to contested matters governed by Bankruptcy Rule 9014 unless otherwise ordered." Bankruptcy D.N.H.R. 9014-1(a). On top of that, the bankruptcy court specifically stated that "a further evidentiary hearing would [not] be required." So there is no doubt that the court did "direct[] otherwise." We need only decide whether this ruling was an abuse of discretion.

It clearly was not. As we have explained, Mission's claim that S & S waived its liens made no sense for a slew of reasons. Given the written record and the absence of any reason to think that S & S gratuitously waived its liens, the bankruptcy court was hardly required to allow a fishing expedition aimed at

unearthing imagined understandings contrary to the record and common sense.  Similarly, there was no need for any evidentiary hearing.  See Hebbring v. U.S. Tr., 463 F.3d 902, 908 (9th Cir. 2006) (holding that where "there [a]re no disputed issues of material fact," "[t]he bankruptcy court [i]s not required to hold an evidentiary hearing"), superseded by statute on other grounds, as recognized in Craig v. Educ. Credit Mgmt. Corp. (In re Craig), 579 F.3d 1040, 1046 n.5 (9th Cir. 2009).

## III.

For the foregoing reasons, we affirm the bankruptcy court's order granting relief from the automatic stay.  Costs are awarded to appellee (S & S).